IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JAMES MORRISON, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BRIAN FETTIG, ET AL., | § | Case No. 4:11-CV-411 |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ACTION FILED UNDER 46 U.S.C. § 30505 SEEKING EXONERATION FROM OR LIMITATION OF LIABILITY**

This case involves a January 2, 2011 fire which destroyed or damaged several boats docked at the Highport Resort & Marina in Pottsboro, Texas. Plaintiffs are James Morrison & CM Capital ("Morrison Parties"). Defendants/Claimants are Lake Texoma Highport, LLC & Federal Insurance Company ("Marina Claimants"); Brian Fettig & Continental Casualty Company ("Fettig Claimants"); Tom and Kathryn Jester & Assurant Specialty Property ("Jester Claimaints") and Victor and Lisa Cranfill ("Cranfill Claimants").

The Morrison Parties filed this suit under 46 U.S.C. § 30505 ("the Limitation of Liability Act") seeking exoneration or limitation from liability for the damages that resulted from the fire. In addition to responding to the allegations of the Morrison Parties and making claims against them along with all other Defendants/Claimants,[1] the Fettig and Cranfill Claimaints have also brought cross claims against the Marina Claimants arguing that they have a right of recovery against the

---

[1] The Cranfills title their claim as *a counterclaim* against the Morrison Parties, *see* Dkt. 37, but the Court treats it as a claim like those brought by all other Defendants/Claimants.

1

Marina Claimants if the Court finds the Marina Claimants responsible for the fire.

The case was assigned to the undersigned by consent of the parties on October 10, 2014. The Court held a bench trial in the matter on October 14, 15, 16, 17 and 28, 2014. At the trial, all parties presented testimony and evidence in support of their respective positions. Having considered the evidence and testimony presented and the arguments of counsel, the Court makes the following findings:

## TESTIMONY AND EVIDENCE PRESENTED

The genesis of this dispute is a boat fire that occurred in the early morning hours of January 2, 2011 at the Highpoint Marina. According to an eyewitness, Michael Wright, the fire occurred a little after 2:00 a.m. Wright, employed by the Highpoint Marina as a courtesy patrol officer, had just finished his break when he noticed an orange glow coming from the dock area. In the marina, there are several docks where boats are moored year round.

As he got closer, Wright noticed that the fire was at L dock in the marina. He called 911. The 911 call was received by the Preston Volunteer Fire department at 2:15 a.m. (Marina Ex. 17). Wright entered the dock through a gate and ran down the dock to the boat on fire.

According to Wright, the only fire at that time was on a boat owned by Chad Morrison (the Morrison boat or Seven Out). The Morrison boat was a 47-foot vessel moored in the L-14 slip of the dock. Wright testified that he grabbed a fire extinguisher to fight the flames which were "creeping over" the four-foot wood finger that separated the Morrison boat from the Fettig boat (or So Easy) which was moored next to the Morrison boat in the L-16 slip.

According to Wright, he cleared the dock after the extinguisher ran out and waited for the fire trucks to arrive. Wright said that it took 20 to 25 minutes for the fire trucks to arrive which was about the time it took for the Fettig vessel to catch fire. Wright was adamant in his testimony that, when he first arrived at L dock, only the Morrison boat was on fire. Two other boats were involved in the fire. The Jester boat was docked in the L-18 slip, the last slip, and the Cranfill boat was docked on the starboard side of the Morrison boat in slip L-12.

According to the records of the Preston Fire Department, the first responder on the scene was Chief Vols. He arrived at 2:21 a.m. Support personnel arrived a few minutes after the chief. Two other fire departments were called in to help fight the fire. According to Chief Vols, both vessels were heavily engaged in fire by the time he arrived.

Wright testified that the direction of the wind caused the fire to burn toward K dock which was about 90 to 100 yards from L dock. No other witnesses were on the scene as early as Wright. Other non-responder eyewitnesses testified that either one or both boats appeared to be on fire after Wright called emergency personnel. No other eyewitness could definitely pin the origin of the fire on the Fettig vessel.

Witness Christy Bliss was staying the night on a boat on N dock at slip 56. In a recorded statement, she stated that she was awakened by a loud pop around 2:20 a.m. This coincides with the time that Wright stated he left the dock because the fire was intensifying and he heard a popping noise. (Marina Ex. 35).

Emergency personnel allowed the Morrison boat to sink. However, the fire on the Fettig boat was put out. Needless to say, both boats sustained major damage.

One of the first responders on the scene was Chief Thomas (then Captain Thomas) of the Preston Volunteer Fire Department. Thomas stated that he arrived only a few minutes after Chief Vols. In a recorded statement, Thomas stated that the main fire was on the Morrison boat, and the Fettig vessel was burning about a quarter of the way. He acknowledged that the boat that sank had the greatest amount of fire. This would have been the Morrison boat. (Fettig Ex. 22).

The dock area between the two boats was extensively damaged. Also, there was testimony that the area above the boats covered by a tin sheet was also extensively damaged. The expert for the Morrison Parties, Glen Lawson, who is an employee of the insurer for the Morrison boat, testified that the most severe fire damage to the roof area was above the Fettig boat. However, the CEO for Highport Marina, Gerald Greninger, noted that Marina Exhibit 24 demonstrated that the most severe damage to the roof was above the Morrison boat. The fire was so intense that two-and-a-half steel girders had to be replaced at slip L-14. There was also extensive damage to the roof above the Morrison boat. Greninger also testified that every dock would have at least three to four fire extinguishers in accordance with Army Corps of Engineer standards. This lends support to Wright's testimony that he used a fire extinguisher to attempt to control the blaze.

Several experts were called by the parties to testify as to the origin of the fire. All experts agreed that according to their professional standards, the cause of the fire for both boats was undetermined. As to the origin of the fire, Michael Brady, expert for Highport Marina, testified that in making his determination he considered statements, arc mapping, burn pattern and fire dynamics. He determined that the most likely origin of the fire was outside the hatch on the deck of the Morrison boat.

Brady also testified that the orange extension cord was most likely the cause of the fire. The extension cord was abused. The plug blades to the extension cord were damaged. The arc marks on the end of the plug blade indicate repeated unplugging of the cord while it was under load.

According to testimony in the case, Morrison had an orange extension cord which ran along the deck and connected into a space heater. The space heater cord was "pinched" between the hatch and connected to the female end of the orange extension cord on the deck. Brady testified that the most likely source of ignition came as a result of a high resistance connection. He pinned most of the problem on cord abuse. Marina Exhibit 24 (HMS1196) is a photograph of the male end of the orange plug. The plug shows damage due to arcing when the plug was removed while power was flowing. Brady also testified that the fire's origin could also be supported because of damage to the area of the roof above the Morrison boat as well as extensive damage to the boat itself.

In summary, Brady theorized that the probable cause of the fire was resistive heating from a high-resistance connection between the space's heater non- grounded power cord and the grounded extension cord. According to Brady, there was either melting or arcing or both at the severed end of the extension cord near where the power cord was plugged into the orange extension cord. No evidence indicates that the GFCI on the marina failed. The space heater power cord was not grounded, and the GFCI would not be expected to interrupt the flow of electricity.

The Fettig boat fared better than that of the Morrison boat. Kyle Young inspected the boat for Fettig's insurer. Although he passed away before trial, the parties agreed to the submission of his report. It was his opinion that the fire originated on the Morrison vessel.

Glen Lawson was called as an expert on behalf of the Morrison Parties. According to Lawson, the fire most likely originated on the Fettig boat. It was his contention that the fire started in the forward bulkhead area. He also stated that roof damage above the L-16 slip where the Fettig boat was docked supported his position.

Based on the testimony of Greninger and Brady, as well as the exhibits reviewed by the Court, the greater fire damage was located above the Morrison boat, not the Fettig boat. Lawson also stated that the prevailing wind was from the southeast which he believes supports his hypothesis that the fire originated on the Fettig boat. Wright testified that the winds were more from the east. He also testified that the flames were driven toward K dock. Scott Hayward, an employee of Highport, noted in a meeting with several personnel including Lawson that the wind was "whipping around the morning of the fire and changed direction several times." (Fettig Ex. 49 at 2).

The Court finds that the prevailing wind is not a prominent factor in considering origin. The boats were in close proximity to each other. Separated by a four-foot wooden dock, the intense heat from one fire could have easily started a fire on the adjoining boat with little wind assistance.

Lawson testified that the structural collapse in the middle of the Fettig boat shows the origin of the fire. He believed that the probable source of the fire was in the bulkhead between the salon and engine compartment which housed bundled wiring and switches. It was his position that the "V" burn pattern he noticed showed movement of the fire from the origin. According to Lawson, the fire migrated to the starboard side of the Fettig boat, causing the Morrison boat to catch on fire on its port side and thereafter fully consuming the Morrison boat.

However, Fettig testified that he arrived soon after the fire was extinguished and that the "V" burn pattern and resultant structural damage testified to by Lawson had not occurred. Fettig stated that the boat was smouldering and still hot to touch, and sometime after the fire was extinguished the physical damage noted and relied upon by Lawson occurred, not during the fire, which would tend to make Lawson's hypothesis as to origin less credible.

Also adjoining the Fettig and Morrison boats were two other boats at slip L-18 (Jester) and slip L-12 (Cranfill). Both of these boats were damaged by what the experts referred to as radiant heat, but they suffered far less damage than the Fettig and Morrison boats.

Lawson took exception to Brady's theory as to origin. He noted particularly that the Morrison boat's fire damage would indicate that the fire went across the deck from the stern to the bow of the boat, indicating that the fire had to originate on the Fettig boat. Lawson also theorized that the fire could not have started where Brady stated because the area had fiberglass that was unburned. He also noted that the engine of the Morrison boat was relatively intact, as well as some rubber hoses in the engine area.

On cross, Lawson admitted that he was unable to identify a specific cause of the fire. He also admitted that Wright had never stated to anyone that the fire started on the Fettig boat.

Two electrical engineers also testified in the case. Although offered by opposing parties, neither Hunter Sims nor Troy Perryman could make a definitive call as to the cause of the fire. Both experts are professional engineers.

Sims testified that the power to the space heater was on at the time of the fire. The charred remains of the space heater were located on the steps down from the hatch leading to the deck. He

7

found no indication that the fire originated from any defect of the power poles next to the Morrison or Fettig vessels. He found no issues with the breaker system on the power poles, nor were there any problems noted with the receptacles on the poles. He also noted that the Morrison rope lights and the Fettig shore power cords did not cause or contribute to the fire. There were, in his opinion, multiple ignition sources in the area of origin on the Morrison boat that could not be ruled out. In his opinion, the fire most likely started because of a high resistance connection in the extension cord, possibly due to cord abuse.

Perryman noted multiple possible ignition sources in his investigation of the Fettig boat. He stated that he and Sims both believed that the space heater did not cause the fire. He noted that the heater was left on, but he was not able to say if it was plugged into the orange extension cord. He believed that the pinch in the heater cable played no part in the fire and that the space heater cable was not a source of the fire. He did not believe that the teak wood deck on the Morrison boat was a cause of the fire. He disagreed with the high resistance connection theory postulated by Sims as a source of the fire. He believed that nothing on the male plug of the space heater demonstrated a high resistance connection in the orange extension cord.

As to the male end of the orange extension cord, he acknowledged that a "parting arc" occurred more than once and that pulling out the plug while power was flowing was not a good practice. Perryman identified four arcing points in the area of the theorized origin of the fire on the Fettig boat. However, he could not determine a specific failure which led him to term the cause of the fire as undetermined. Although he gave multiple reasons for his theory that the fire did not originate on the Morrison boat, he did admit that the orange extension cord was "energized" at the

8

time of the fire.

Fettig also testified and noted that he saw the orange extension cord plugged into the dock and extending into the Morrison boat sometime before the fire. Fettig also disputed that his boat caused the fire, noting that he had a fire suppression system which was always left connected. Had the fire started where the experts stated it started, Fettig testified, the suppression system would have extinguished any fire.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

All experts presented plausible theories as to the cause and origin of the fire. The Court makes the following findings of fact as to the origin and cause of the fire.

1. The Court finds, by a preponderance of the evidence, that the fire originated on the Morrison boat. This finding is largely supported by the eyewitness testimony of Michael Wright who has never wavered in what he observed. The finding is also supported by the pattern of the Morrison boat burn and the more extensive fire damage noted above the Morrison boat. Further, Captain Thomas also lends credence to Wright's insistence that the fire originated on the Morrison boat in that, when he arrived, only about 25% of the Fettig boat was on fire, but the Morrision boat was fully engulfed in flames. Bliss's statement notes that the sounds she heard were at or near the time Wright was on the dock trying to contain the Morrison fire. It is at this time that he feared for his own safety and had to give up his efforts to contain the fire on the Morrison boat. He also testified that he used an extinguisher to fight the fire. Testimony noted that L dock had at least three extinguishers and the extinguisher used was still in the boat facilities offices.

2. The Court further finds, by a preponderance of the evidence, that the orange extension cord was the cause of the fire. The cord was plugged into a pole on the dock. There is enough circumstantial evidence to support the finding that the space heater was in the "on" position. A defect in the cord, which certainly could have resulted from abuse, was the cause of the fire. Pictures of the male end of the cord demonstrate parting arcs over a period of time. Power was flowing through the cord at the time of the fire, and remains of the cord indicate a high resistance connection, which most likely caused the fire. At least two witnesses observed the cord plugged into the power pole at L-14. No one could identify any "off boat" source of the fire either as to the Fettig vessel or the Morrison vessel. Finally, by determining the fire originated on the Morrison boat, the cause could not have come from any source on the Fettig boat. Therefore, the most likely source lies in the extension cord which was left powered and plugged into the space heater on the Morrison boat.

Next the Court must consider whether negligence or unseaworthiness caused or contributed to the fire, and if so, whether any party had knowledge or privity. *In re Brasea, Inc.*, 583 F.2d 736, 738 (5th Cir. 1978). The Court makes the following findings and conclusions of law.

3. No act or omission by the Marina, Fettig, Jester, or Cranfill Claimants was the contributing or proximate cause of the fire.

4. Even if he allowed others to use or access the boat, Morrison had responsibility for the safety, condition, care, and maintenance of the vessel.

5. The fact that a cord was left plugged into the space heater when the boat was unattended was not a safe practice and was, in fact, negligent. Having heard the evidence presented, the Court finds that Morrison's use of the space heater was a "short hand rendition" at winterizing

his boat. The absence and failure to man or attend the Morrison vessel also allowed the fire originating on the vessel to go undetected.

6. Defendants/Claimants have sustained their burden in showing that Morrison's negligence was a proximate cause of the fire which destroyed the Morrison boat but also damaged the other vessels and property owned by the Claimants/Defendants.

7. Under the Limitation of Liability Act, if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts. 46 U.S.C. § 30505. *See also In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001) ("Once the claimant establishes negligence or unseaworthiness, the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge."); *In re Signal Intern.*, LLC 579 F.3d 478, 496 (5th Cir. 2009) ("Once a claimant proves that negligence or unseaworthiness caused an accident, an owner seeking limitation must show it lacked privity or knowledge of the condition.") (citation omitted).

8. Under the Limitation of Liability Act, the question of vessel owner's privity or knowledge of the unseaworthy conditions or negligent acts must turn on the facts of the individual case. *In re Hellenic Inc.*, 252 F.3d at 395*; Brister v. A.W.I., Inc.,* 946 F.2d 350, 355-56 (5th Cir. 1991).

9. Privity or knowledge implies some sort or complicity in the fault that caused the accident. *Brister,* 946 F.2d at 355.

10. Here, the evidence shows that Morrison was complicit in the fault.

11. Morrison was observed on more than one occasion yanking the extension cord out of the plug on the dock as his boat was being operated. Morrison's recorded statement to the insurance adjuster further demonstrates that he knew the space heater was used and suggests that he used it at least while the boat was docked. (Marina Ex. 26). His trial testimony claiming lack of use of the heater was not credible on this issue.

12. The Court finds that there is sufficient evidence in the record to show that Morrison had knowledge of the use of the heater and extension cord or privity of those same acts and that he did not sustain his burden in showing that he lacked such privity or knowledge. "[W]hen an owner is in control of and operating his pleasure craft he has privity or knowledge with respect to its operation, therefore he is not entitled to limitation for accidents arising from his negligence." *Fecht v. Makowski*, 406 F.2d 721, 722 (5th Cir. 1969). Although it is undisputed that Morrison was not operating the boat on the water at the time of the fire, Morrison's boat was a pleasure craft, not a commercial freighter. He was not an arm's length owner or investor; it was his personal vessel. As such, the Court finds his degree of privity to be significantly stronger.

13. Morrison has not shown that his personal pleasure craft was not under his direct control – either for use or repair – at the time the heater was plugged into the extension cord which is the negligent act here. He further has not shown that he lacked actual knowledge of and control over the use of the heater and extension cord on his boat. Indeed, the evidence indicates his personal participation in at least the cord abuse, which ultimately was the likely cause of the fire. *Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996) ("Thus, consistent with the statutory purpose to protect innocent investors, 'privity or knowledge' generally refers to the vessel

owner's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness which caused or contributed to the accident."). He is not entitled to the limitation of his liability here.

14. Morrison did not satisfy his burden of proof to limit liability. His negligence proximately led to the fire and resulting damage to the marina and to the adjoining boats. He has not shown absence of privity or knowledge required to limit liability.

15. The Claimants suffered injury and are entitled to recover damages. The parties have stipulated to damages. According to the stipulation, the Marina Claimants should recover $171,262.93; the Cranfill Claimants should recover $75,024.28, as elected at the time of trial; the Fettig Claimants should recover $210,099.77; and the Jester Claimants should recover $50,282.87.[2] Claimants shall also be awarded their costs and interest.

16. Because the Court has not found that any fault lies with the Marina Claimants as to the fire, the Fettig and Cranfill Claimants' cross claims against the Marina Claimants are dismissed as moot.

**SO ORDERED.**
**SIGNED this 4th day of November, 2014.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE

---

[2] Although the Morrison Parties made some argument about the amount of damages at the closing arguments herein, the parties stated on the record in both the Final Pretrial Order (*see* Dkts. 87 & 112) and at the commencement of the trial that they had stipulated to the amount of damages which were recoverable. The Court will not intervene in the parties' stipulation as to the amounts recoverable.